UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
STEVEN E. TIRRELL,

                      Plaintiff,

    —against—

NANCY A BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,[1]

                   Defendant,
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**

15-CV-518 (KAM)

**MATSUMOTO, United States District Judge:**

       Plaintiff Steven E. Tirrell brings this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g), seeking review of a final decision of the Acting Commissioner of Social Security ("Defendant" or "Commissioner") which held that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act and was, therefore, ineligible for Disability Insurance Benefits.   Plaintiff and Defendant now cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).   For the reasons set forth below, Defendant's motion is denied and Plaintiff's cross-motion is granted to the extent of reversing the Commissioner's decision and remanding this action to the Commissioner for further proceedings consistent with this decision.

## BACKGROUND

### Plaintiff's Education and Work History

       The following facts are drawn from the Administrative Record (ECF Document 22), and the numbers in parentheses denote pages in that document.   Plaintiff was born in 1965 and

---

[1] This action was originally brought against Carolyn W. Colvin in her capacity as Acting Commissioner of Social Security.   When Nancy A. Berryhill became Acting Commissioner in 2017, she was automatically substituted as defendant by operation of Fed. R. Civ. P. 25(d).

graduated high school in 1983.  (205, 209).  He worked for two or three years installing and repairing lawn sprinklers for Rain Mist Lawn Sprinklers in Staten Island.  (239, 242).  In 1986, he began working as a carpenter and became a member of the United Brotherhood of Carpenters and Joiners.  (242).

Plaintiff worked for a variety of employers between 1986 and 2003.  (198-200).  It is unclear whether he was continuously employed.  Plaintiff's DISCO DIB Insured Status Report indicates that Plaintiff had no earnings between 1991 and 1997, aside from $1,870 in 1993, (195), but there is no evidence as to whether Plaintiff was not working at all or working off-the-books during this period.

There is evidence that Plaintiff had at least three operations between 1986 and 2003: one to repair a hernia in 1987 and two surgeries to his left shoulder in 1990.  (261).  He also had problems with his left knee, as revealed by a March 30, 2003, MRI of the left knee which showed degeneration of the posterior horn of the medial meniscus and, perhaps, a small interstitial tear of the anterior cruciate ligament.  (310).  The Administrative Record does not contain any doctor's records relating to the operations or the knee problem.

Sometime in 2003, Plaintiff began working for the New York City Health and Hospitals Corporation ("HHC").  (239, 242).  In 2003 and 2004, Plaintiff apparently worked for HHC part-time, earning less than $30,000 per year.  (200).  By 2005, however, Plaintiff was apparently working for HHC full-time, earning more than $89,000 in 2005, more than $86,000 in 2006, about $72,500 in 2007, and $82,700 in 2008.  (200-01).

While employed as a carpenter, Plaintiff experienced problems with both hands. Plaintiff claims that he broke his right hand twice, most recently in 2005.  (99).  In 2008, he had

surgery on his left pinky to repair nerve damage and to remove a tumor.   (99).   The

Administrative Record contains no medical records relating to Plaintiff problems with his hands.

In February or March 2009, Plaintiff was laid off by HHC.   (97, 208).   He attempted to

find work through his union, but there was no work because "the economy crashed." (99).

Plaintiff collected unemployment benefits for a year and a half, then began living off his savings

and money withdrawn from his annuity fund.   (96).

***Plaintiff's Medical Problems Develop***

Although Plaintiff claims that he stopped looking for work after he "got sick in 2010,"

(97), there is no indication in the Administrative Record that he sought medical assistance until

early 2011.   On January 3, 2011, he visited Dr. William Tursi, an internist, complaining of

trouble urinating and pain in his knees, shoulders, elbow, and lower back.   (259).   Upon

examination, Dr. Tursi found that Plaintiff had an enlarged prostate, a reduced range of motion in

the left shoulder, fungus on his penis, and a lesion on his tongue.   (258).   Dr. Tursi referred

Plaintiff to a urologist and to an "ENT" (an otorhinolaryngologist).   (258).   Although Dr. Tursi

also noted tenderness in Plaintiff's knees and right elbow, (258), the doctor did not refer Plaintiff

to a specialist for these problems.

Plaintiff was examined by Dr. Mark E. Carney of ENT and Allergy Associates, LLP, on

February 21, 2011.   (270, 311).   Although Plaintiff complained of "having swelling under [his]

chin for a few months," no "neck masses" were apparent upon Dr. Carney's examination.   (270,

311).   The doctor found that Plaintiff had "chronic laryngitis," but no other "apparent

path[ology]."   (270).

Plaintiff visited Dr. Joel Sherman of Consultants in Urology, P.C., on March 9, 2011. Plaintiff complained of pain in his testicles and right groin and of "incomplete emptying following urination." (269). Dr. Sherman performed sonograms, but found that Plaintiff's "postvoid residual volume" was within normal limits and that there was no evidence of testicular or scrotal pathology. (269). Although the physical examination uncovered no evidence of an inguinal hernia or urological problems, Dr. Sherman recommended a "general surgical evaluation" and referred Plaintiff to Dr. Michael Castellano. (269)

Dr. Castellano, a surgeon, examined Plaintiff on April 12, 2011. Dr. Castellano noted that Plaintiff had undergone surgery in 1987 to repair a right inguinal hernia, and that the pain Plaintiff was reporting was consistent with a recurrence of this condition. (268). The doctor then performed a physical examination, which revealed "a mild to moderate sized defect" but "no evidence of incarceration or strangulation." (268). Dr. Castellano recommended surgery but Plaintiff, who was uninsured, was unwilling to schedule the surgery at that time. (269).

Plaintiff returned to Dr. Tursi's office on April 13, 2011, complaining about a recurrent rash on his penis. (257). The doctor diagnosed balanitis, an inflammation of the glans, and prescribed Lotrisone cream, which combines a steroid and an antifungal medication. (257, *see* https://www.drugs.com/lotrisone.html). A week later, however, Plaintiff visited Dr. Sherman, who determined that Plaintiff had both recurrent balanoposthitis—an inflammation of both the glans and the foreskin—and phimosis, an inability to retract the foreskin covering the glans. (301). Since the cream was yielding "intermittent results," Plaintiff requested that a circumcision be performed at the same time as the hernia repair. (301).

Plaintiff saw Dr. Tursi for a third time on August 10, 2011. This time, Plaintiff complained not only of pain in the groin, but also pain in the knees, left shoulder, right elbow and back. (256). Upon examination, Dr. Tursi determined that Plaintiff had a reduced range of motion in the left shoulder upon adduction and abduction and atrophy of the left deltoid muscle. (256). The doctor further noted that Plaintiff's knees and lumbosacral region were tender. (256).

Dr. Tursi attributed the shoulder problems to a torn ligament and the groin pain to the hernia that had been diagnosed by Dr. Castellano. (256). He was less certain about the knee and back pain, stating that the former was probably due to torn menisci and that the latter was probably due to a herniated disc. (256). He prescribed physical therapy and opined that Plaintiff was probably disabled. (256).

On August 15, 2011, Dr. Tursi wrote a three-sentence note in which he stated that Plaintiff was "unable to work." (265). The note recounted the findings of the doctor's August 10, 2011, examination: that Plaintiff had "a right inguinal hernia" which required surgery, "a probable torn meniscus to the right and left knees," a torn ligament and a decreased range of motion in the left shoulder, and a "herniated disc at L5." (265) That note was not addressed to anyone and offered no opinion regarding how these various impairments impacted Plaintiff's residual functional capacity.

Plaintiff visited Dr. Castellano for a second time on September 22, 2011. He complained of persistent pain and discomfort in the right groin, as well as some soreness on the left side. (266). Upon examination, Dr. Castellano found that the hernia remained "small to moderate sized," with "no significant protrusion," and that there was no "evidence of

5

incarceration or strangulation" or "obstructive symptoms." (266). The doctor found "no obvious hernia" on the left side. (266). Plaintiff again expressed a desire to delay surgery until he was insured and to have a simultaneous circumcision. (266). Dr. Castellano agreed to wait but noted, "if his symptoms worsen, he may need to present to the Emergency Room." (266).

Plaintiff visited Dr. Tursi three more times between October 1 and November 8, 2011. On October 1, 2011, he complained about the hernia and asked for another surgical referral. (255). The doctor's records reflect that someone in Dr. Tursi's office gave him a referral, but do not reflect the name of the surgeon to whom Plaintiff was referred. (255).

On October 31, 2011, Plaintiff complained of pain in his left shoulder, right elbow, left knee, back, and wrists. Although he did not complain of pain in the groin, the notes stated that Plaintiff had an appointment for a "hernia evaluation" at Staten Island University Hospital's surgical clinic. (254). Dr. Tursi opined that Plaintiff had a right inguinal hernia, a herniated disc, and possibly problems with his right meniscus.

On November 8, 2011, Plaintiff presented with flu-like symptoms, including a cough, a sore throat, and chills and sweats. (253). The doctor diagnosed Plaintiff with acute bronchitis (ICD-9 Diagnosis Code 466.0) and may have prescribed a "Z-Pak" containing Zithromax, an antibiotic. (253).

Sometime on or before November 14, 2011, Plaintiff was sent for a CT scan of the abdomen and lower pelvis by Dr. Karthik Raghavan, a surgeon affiliated with Staten Island University Hospital. (308-09). That scan showed some minor abnormalities in the left lung and liver, but no evidence of an abdominal hernia. (308-09).

*Plaintiff's Application for Social Security Benefits*

In early September 2011, Plaintiff engaged Mario Davila of Binder and Binder to represent him in connection with a claim under Title II of the Social Security Act. (125). Davila filed a claim with the Social Security Administration ("SSA") on November 23, 2011. (190-91, 205-06). The claim alleged that Plaintiff had been disabled since January 1, 2011, and listed eight medical conditions that limited his ability to work: 1) soft tissue injuries of the arm, 2) soft tissue injuries of the knee, 3) carpal tunnel syndrome, 4) severe back pain, 5) a lumbar spine impairment, 6) a cervical spine impairment, 7) headaches and 8) a right inguinal hernia. (208).

As part of his application for benefits, Plaintiff completed a "Function Report," in which he described his physical limitations. He stated that he could not stand "for long periods," (217, 219), and that he could only walk 100 to 500 feet before having to stop and rest for a period of five minutes. (221). He also stated that he could not raise one of his arms over his head and found it "hard to bend and twist." (215, 219). In addition, he noted that various other activities—including sitting, climbing stairs, kneeling, squatting, reaching, and using his hands—would "hurt[ ] after awhile," (220), but did not specify how long he could perform these activities before resting or stopping.

The Function Report also contained some information concerning Plaintiff's daily activities. The report revealed that Plaintiff, who was unemployed and lived alone, did most of his chores himself. He was able to attend to his personal needs, such as bathing, dressing, shaving, and feeding himself, although his inability to raise his arm over his head impeded his ability to remove shirts. (215-16). He could cook for himself, but could not "stand for long

periods" and used a timer so that he could sit while cooking. (217). He could "do house chores a little at a time," but needed help with "heavy lifitng." (217). He was able to walk and drive a car, and attempted "to get out daily" and "to see friends a couple times a week." (217, 219).

Although Plaintiff had seen at least two specialists and two surgeons within the 12 months prior to filing his application, Plaintiff's paperwork listed Dr. Tursi as the only health care professional or facility with medical records pertaining to Plaintiff. (211). Indeed, the paperwork implied that Dr. Tursi was Plaintiff's only doctor by stating that he had treated Plaintiff for "all medical conditions." (211). In addition, Plaintiff's Disability Report stated that Dr. Tursi had last seen Plaintiff on October 1, 2011, (211), even though Dr. Tursi had seen Plaintiff on two other occasions since then and as recently as November 8, 2011. (253-54).

Plaintiff's claim was assigned to an Examiner Scott, who promptly requested Plaintiff's medical records from Dr. Tursi. (226). Those records were received on December 13, 2011, (226), but apparently included records only for the period from January 1 to November 1, 2011. (134). While those records may have included letters sent to Dr. Tursi by the specialists and surgeons, Examiner Scott made no effort to obtain medical records from any other doctors or any medical facilities. (134, 226-29).

Plaintiff visited doctors on several occasions in December 2011 and January 2012. On December 6, 2011, Plaintiff saw Dr. Raghavan, complaining of chronic pain to the right groin, which increased when Plaintiff lifted weights. (305). In light of the results of the November 14, 2011, CT scan, Dr. Raghavan found no evidence of a hernia. (305). Noting that Plaintiff had previously had a right inguinal hernia repaired, Dr. Raghavan opined that Plaintiff was

experiencing post-operative neuralgia and that no surgery was necessary. (305). The doctor further opined that Plaintiff might need physiotherapy or a neurological evaluation. (305).

On December 7, 2011, Plaintiff visited Dr. Tursi, complaining of lightheadedness and a headache, as well as groin pain, testicular pain, and pain in both knees and "all other joints." (290). Dr. Tursi attributed the joint pains to arthritis and a herniated disc. (290). He did not diagnose the cause of the lightheadedness and headaches, but apparently believed that it was due to Plaintiff's blood pressure, which measured 150/100. (290). Dr. Tursi prescribed Losartan—a drug used to treat high blood pressure—and Tylenol #3—a pain reliever which contains a combination of acetaminophen and codeine. (290).

On December 27, 2011, Plaintiff returned to Dr. Castellano, complaining of persistent and worsening pain in the right groin. (279). Although Dr. Castellano was aware of Dr. Raghavan's opinion, Dr. Castellano discounted it, noting that "30-40% of inquinal hernias will not be detected on CT scan unless they are incarcerated." (279). Dr. Castellano noted that there was no evidence of incarceration and that a physical examination "demonstrate[d] a small but obvious defect in the medial aspect of the floor of the inguinal canal consistent with a direct recurrent right inguinal hernia." (279). Accordingly, Dr. Castellano continued to recommend surgery. (279). Since Dr. Sherman did not accept Plaintiff's insurance, Dr. Castellano referred Plaintiff to another urologist, Dr. Savino. (279).

Plaintiff followed up with Dr. Tursi on December 30, 2011. His blood pressure was lower, but he was still complaining of lightheadness. (289). Dr. Tursi doubled the dose of Losartan from 50 to 100 milligrams. (289).

Plaintiff's blood pressure was normal when he returned to Dr. Tursi on January 18, 2012. (288). However, Plaintiff continued to complain of lightheadedness "on and off," and particularly when arising from a standing position. (288). Dr. Tursi apparently believed that these symptoms were attributable to hypertension and recommended an echocardiogram and a carotid doppler. (288).

Although Examiner Scott did not obtain any of Plaintiff's medical records for December 2011 or January 2012, he did send Plaintiff to Dr. Aurelio Salon of Industrial Medicine Associates, P.C., for an internal medicine examination. (271-75). Dr. Salon, in turn, sent Plaintiff to IMA Disability Services for X-rays of the cervical and lumbosacral spine. The cervical X-ray (277) showed "mild disc thinning" at C3-C4, which was deemed the product of "discogenic disease"—an age-related deterioration of the spinal discs, also known as degenerative disc disease. *See* https://www.laserspineinstitute.com/back_problems/spinal_ anatomy/disease _def/. The lumbosacral study proved negative. (276).

Dr. Salon took a detailed medical history, in which Plaintiff described various impairments. For example, Plaintiff complained of "multiple joint pain," including "neck pain for several years" and lower back pain since 1994. (271). He also stated that he had been diagnosed with hypertension the previous year, (271), and suffered migraine headaches three to four times a month. (272). Although Plaintiff claimed that his most recent headache occurred the previous week, Dr. Salon's examination did not show that Plaintiff was still suffering from any of these impairments. Dr. Salon found that Plaintiff had a full range of motion in his cervical and lumbar spine, as well as a full range of motion in his shoulder, elbows, forearms, wrists, hips, knees and ankles. (274). Plaintiff's blood pressure was only slightly high, (273),

and his joints were "stable and nontender." (274). Accordingly, while Dr. Salon found that Plaintiff had a history of hypertension, low back and neck pain, joint pain, and migraines, he found "no objective findings to support the fact that the claimant would be restricted in his ability to sit or stand, or in his capacity to climb, push, pull or cary [*sic*] heavy objects." (275).

Examiner Scott never requested a residual functional capacity ("RFC") assessment from Dr. Tursi and apparently did not credit Dr. Salon's assessment. The examiner completed his own Physical Residual Functional Capacity Assessment which stated that Plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday, and could climb, stoop, kneel, crouch and crawl without limitations. (119-20). The basis for the Examiner's assessments is unclear. In places, Examiner Scott's Physical Residual Functional Capacity Assessment either misstated the record or demonstrated that Examiner Scott did not have complete, up-to-date medical records. First, it stated that the "medical exam [of] 9/22/11 show[ed] no evidence of no [*sic*] obvious hernia" and that the exam was "unremarkable." (119). In fact, Dr. Castellano's September 22, 2011, examination found "no obvious hernia" on the left side, but a "small to moderate sized" hernia on the right side. (266). Examiner's Scott's Assessment also stated that Plaintiff was receiving no medication for any ailments or medical conditions, (119), even though Dr. Tursi had prescribed both Losartan and Tylenol #3 in early December 2011, (290), and doubled the dosage of Losartan in late December 2011. (289).

On January 31, 2012, Examiner Scott denied Plaintiff's claim for Disability Insurance Benefits. In the Explanation of Determination, the Examiner implicitly relied on his or her own RFC Assessment in determining that Plaintiff was capable of performing light work. (134).

However, the Examiner did not explain the basis for that RFC Assessment, stating only: "[B]ased on your age of 46 years, your education of 12 years, and your experience, you can perform light work ...." (134).

***Plaintiff's Medical History between February 1, 2012, and June 17, 2013***

In February 2012, Plaintiff met with two new doctors: Dr. Peggy Ann Garjian, a rheumatologist, and Dr. Michael Savino, a urologist. Plaintiff had an initial consultation with Dr. Garjian on February 8, 2012, (392), and visited her on at least four more occasions between then and January 4, 2013. Although the Administrative Record contains medical records relating to these five visits, (392-397), the Court is largely unable to decipher Dr. Garjian's handwriting.

Dr. Savino examined Plaintiff on February 10, 2012. (306). The doctor noted, *inter alia*, that Plaintiff had a history of penile fungal infections and wanted to be circumcised to reduce the likelihood of further infections. (306). Dr. Savino agreed to discuss with Dr. Castellano the possibility of performing the circumcision at the same time as the hernia repair. (306).

According to a letter that Dr. Castellano sent to Dr. Tursi on March 8, 2012, that combined surgery took place without any complications on February 29, 2012. (278). Although the Administrative Record contains no documents relating to the surgery, Dr. Castellano's letter stated that he advised Plaintiff to avoid heavy lifting or strenuous activity for the next several weeks, then discharged him without scheduling a follow-up appointment. (278). There are no records from Dr. Castellano or Dr. Savino for any dates subsequent to March 8, 2012.

Plaintiff continued to see Dr. Tursi on a regular basis.   On February 18, 2012, Plaintiff again complained to the doctor of lightheadedness, especially when rising from a seated position. (287).   Since the carotid and vertebral artery dopplers which the doctor had ordered on January 18, 2012, did not show significant abnormalities, (303), Dr. Tursi diagnosed Plaintiff with vertigo.   (287).   The doctor recommended that Plaintiff have an MRI of the head.   (287).

Plaintiff visited Dr. Tursi again on April 4, 2012.   Dr. Tursi noted that Plaintiff had had his hernia surgery, had seen Dr. Garjian for his joint pain, and had an appointment with a hematologist to discuss an increase in his hemaglogin levels.   (286).   The Administrative Record contains a business card from a hematology practice, M.H. Aly, M.D., P.C., (245), and a statement from Plaintiff in which he recounts advice he received from Dr. Yumi Kim, one of the doctors affiliated with that practice.   (244).   However, it does not contain any medical records from the practice or from Dr. Yumi Kim.

According to questionnaires completed by Dr. Tursi, Plaintiff continued to visit him every two or three months until at least mid-June 2013.   (312, 486).   The Administrative Record, however, does not contain any medical records of visits subsequent to April 4, 2012. Dr. Tursi's continued treatment of Plaintiff is verified to some degree by tests results addressed to Dr. Tursi and questionnaires that the doctor completed in May and October 2012 and June 2013.

The first of these tests was an MRI of the brain performed on May 8, 2012—presumably, the MRI which Dr. Tursi recommended in mid-February.   The test showed abnormalities in the frontal lobes which, the radiologist opined, might be "related to migraine headaches."   (325).

After reading this, someone scrawled a note at the bottom of the radiologist's report, which reads: "Changes consistent with migraine headaches. Refer to Dr. Perel." (325).

On May 22, 2012, Plaintiff met with Dr. Allan B. Perel, a neurologist. Plaintiff complained not only of headaches, but also of dizziness, tinnitus, blurred vision, fatigue, and pain in his lower back and neck. (327). The doctor's examination of Plaintiff's neck revealed a moderate paraspinal muscle spasm and a decreased range of motion on all directions by 20-30 degrees. (327). Dr. Perel diagnosed Plaintiff with migraine headache disorder and prescribed "a short course of corticosteroids to help break the headache cycle." (328). The doctor also ordered a videonystagmogram to evaluate Plaintiff's vertigo and an MRI of the cervical spine, and recommended that Plaintiff start "rehabilitative therapy for both his cervical and lumbar pathology." (328).

Plaintiff had the MRI on May 25, 2012. This study revealed that Plaintiff had generalized mild narrowing (or stenosis) of the cervical canal, which the radiologist believed was likely congential. (324). On top of that, Plaintiff had degenerative changes at C3-C4, C5-C6, and C6-C7, including bulging discs and mild spurring. (324). The result of these pathologies was "[s]evere right foraminal stenosis" at C5-C6, and "bilateral foraminal stenosis" at C6-C7. (324).

On June 5, 2012, Plaintiff began treating with Dr. Helen H. Kim, an otolaryngologist affiliated with Clover Lakes ENT, P.C. ("Clover Lakes"). Although Clover Lakes administered a Vestibular Autorotation Test, (345)—a computerized test of the Vestubulo-Ocular reflex used in evaluating dizziness—it is unclear whether Plaintiff ever had the videonystagmogram Dr. Perel ordered. The Administrative Record does not contain any medical records from Dr. Perel, other

14

than his letter to Dr. Tursi discussing the initial May 22, 2012, examination. However, it seems highly likely that Dr. Perel saw Plaintiff at least once more, since he subsequently referred Plaintiff to Dr. Kiran V. Patel of the Spine & Pain Institute of New York. (369).

It is unclear whether either Dr. Perel or Dr. Tursi referred Plaintiff to Dr. Kim and/or Clover Lakes. The records reflect that Plaintiff came to Dr. Kim principally complaining of difficulty swallowing and a "stabbing" pain in his throat which had persisted for 1-6 months. (339). After performing a physical examination and an endoscopic examination of Plaintiff's nose and throat, Dr. Kim diagnosed with dysphagia (difficulty swallowing), a nontoxic uninodular goiter, chronic rhinitis, and other nasal abnormalities, including a deviated nasal septum and turbinate hypertrophy. (340). Dr. Kim ordered a transcranial doppler, which measures the velocity of blood flowing through the vessels in the brain, as well as ultrasounds of the thyroid and carotid arteries. (340). All three ultrasounds were performed on June 7, 2012, and found no abnormalities. (352-54).

Plaintiff visited Clover Lakes on at least three more occasions over the next two months, (329-38), and underwent additional testing. On June 19, 2012, Plaintiff had the Vestibular Autorotation Test, the results of which were within normal limits. (345). On July 6, 2012, Plaintiff had another MRI of the brain, which confirmed the findings of the May 2012 study. (343). On July 12, 2012, Plaintiff had an esophagram, a type of X-ray used to evaluate the pharynx and esophagus. That test revealed a small hiatal hernia—a condition in which part of the stomach pushes up through the hiatus, the opening in the diaphragm through which the esophagus passes. (342, *see* http://www.mayoclinic.org/diseases-conditions/hiatal-hernia/

basics/definition/con-20030640).  However, that hernia was not large enough to allow food and acid to back up into the esophagus, or to necessitate intervention.  (342).

During this same period, Plaintiff also had medical tests that appear to have been ordered by Dr. Perel and/or Dr. Tursi.  On June 12, 2012, Plaintiff underwent an electromyography and nerve conduction study of the upper extremities which revealed "C5-C6 radiculopathy with denervation in the paraspinal muscles."  (320).  On July 11, 2012, Plaintiff had an MRI of the left knee, which showed degeneration of the posterior horn of the medial meniscus.  (375).  The radiologist compared the MRI to the results of the same study performed in March 2003, and opined that the degeneration showed "no appreciable progression."  (375).

Although there are no medical records from Drs. Tursi or Perel for the period after April 4, 2012, there are records from other medical providers.  First, there are records from Richmond Rehabilitation which indicate that Plaintiff underwent physical therapy two to three times each week from June 7 to August 20, 2012.  (359).  According to the prescription, Plaintiff was referred to physical therapy for "cervical myofascial pain."  (360).  An examination conducted by one of Richmond Rehabilitation's physical therapists revealed that Plaintiff had a decreased range of motion in the cervical spine, as well as pain and spasms in muscles extending from the back of the head to the upper back and shoulders.  (361).

Second, there are records from Dr. Patel, the pain specialist to whom Plaintiff was referred by Dr. Perel.  Plaintiff first visited Dr. Patel on July 20, 2012, complaining of neck pain radiating into both arms and causing numbness and tingling in his fingers.  (369).  He also complained of lower back pain radiating into both legs.  (369).  Plaintiff claimed to be in

substantial pain, rating the neck pain as 6 out of 10 on average and 10 out of 10 at its worst, and rating the lower back pain as 8 out of 10.   (369).

Upon examination, Dr. Patel found mild tenderness in the lower back and moderate tenderness in the upper back.   (369).   She further found that Plaintiff had a decreased range of motion in both areas of the back.   (369-70).   Since Plaintiff reported a history of shoulder surgery and a hernia repair, the doctor also examined the shoulder and inguinal regions and found them tender to palpation.   (370).

After reviewing the results of the May 2012 MRI of the cervical spine, Dr. Patel opined that Plaintiff had a cervical disc disorder with related neurological defects and cervical radiculopathy.   (370).   She gave Plaintiff an epidural steroid injection at C7-T1, (371), and ordered an MRI of the lumbar spine.   (370).   That MRI, which took place on August 12, 2012, revealed some degenerative lumbar disc changes:   "subtle" disc bulges at L1-L2 and L2-L3, and a central disc bulge at L5-S1 abutting the thecal sac.   (376).   There was no evidence of a disc herniation or of spinal canal or foraminal stenosis.   (376).

Plaintiff visited Dr. Patel about once a month between August 2012 and April 2013.   On August 21, 2012, Plaintiff reported that he had experienced no relief from the steroid injection, rating his neck pain as 6 out of 10 and his lower back pain as 3 out of 10.   (373).   He stated that his symptoms were aggravated by sitting, standing, and walking for extended periods and improved by resting.   (373).   Dr. Patel prescribed Cymbalta, an antidepressant which is also used to treat chronic pain, and discussed the possibility of a cervical medial branch block, a injection which temporarily stops the transmission of pain signals.   (374).

Plaintiff had both a cervical medial branch block and an inguinal nerve injection on September 18, 2012. (379). When he returned to Dr. Patel's office on October 16, 2012, he reported that these injections had given him "5% relief for one week." (379). He was no longer receiving physical therapy and had been unable to fill the prescription for Cymbalta because of "an issue at the pharmacy." (379). He continued to have pain in his neck and lower back, which he rated as 8 out of 10, and stated that the neck pain radiated into his fingers, causing numbness and tingling. (379).

Plaintiff's condition had not changed much by the time of his December 4, 2012, visit to Dr. Patel's office. Plaintiff was taking Cymbalta, but without much relief. (381). He rated his neck pain as 8 out of 10, and his lower back pain, which radiated down to his knees, as 6 out of 10. (381). Plaintiff also complained of persistent pain in the groin, prompting the doctor to propose another injection: a genitofemoral nerve block. (382). That injection was administered on December 18, 2012. (398). The doctor prescribed Tramadol, a narcotic-like pain reliever that is used to treat moderate to severe pain. (382, https://www.drugs.com/tramadol.html).

On December 24, 2012, Plaintiff passed out after mixing beer and two Tramadols. (438). According to a friend, he struck his head on a metal stand, causing a laceration to the head that required treatment at an Emergency Room. (438). During triage at the Richmond University Medical Center, Plaintiff stated that he had entertained thoughts of suicide, though he did not have a plan or the means to kill himself. (438). After CT scans of the head and maxillofacial bones proved negative, (432-33), Plaintiff's lacerations were sutured and he was released. (436-37).

Plaintiff reported this incident upon his next visit to Dr. Patel, which occurred on January 15, 2013. (400). Believing that the Tramadol had caused him to pass out, he was no longer taking the drug but was taking Vicodin prescribed by Dr. Tursi. (400). He reported that the genitofemoral nerve block had provided only "5% relief for one week," (400), but complained primarily of pain in his neck, which he rated as 10 out of 10. (400). He rated his lower back pain at 4 out of 10, and stated that walking aggravated this pain. (400). Plaintiff also complained of pain in both knees.

Upon examination, Dr. Patel noted that Plaintiff's knees were tender and performed McMurray tests, which revealed damage to the menisci. (401). The doctor injected Plaintiff's knees with Supartz, a hyaluronic acid derivative which increases the effectiveness of the fluid within the knee joint. (401, https://www.drugs.com/cdi/supartz.html). Dr. Patel also prescribed Neurotin, an anticonvulsant medication which is also used to treat nerve pain, (401, *see* https://www.drugs.com/neurontin.html), and proposed a spinal cord stimulator trial to address Plaintiff's spinal pain. (401).

Plaintiff knees remained tender upon his next visit to Dr. Patel on February 12, 2013. (404). The doctor examined the knees, noting a decreased range of motion with pain. (404). She injected his left knee with a combination of steroids and Supartz. (404-05). Since Plaintiff continued to suffer from neck, lower back, and inguinal pain, Dr. Patel increased the dosage of Neurotin and again discussed the possibility of a neurostimulator trial. (405),

Over each of the next five weeks, Plaintiff had one or the other of his knees injected with the steroids and Supartz. On February 19, 2013, he had an injection in the right knee. (407). Although he claimed that this procedure provided only "5% relief for four days," (409), Dr. Patel

19

repeated the procedure on February 26, 2013. (410). That day, Plaintiff reported severe lower back pain (7 of 10 on average and 10 of 10 at worst), which was exacerbated by sitting, standing and daily activities. (409). Dr. Patel ordered an MRI of Plaintiff's thoracic spine. (410).

Plaintiff had two more injections in his left knee on February 5 and 12, 2013, and another injection in his right knee on March 19, 2013. (411-12, 421-24). On March 19, 2013, Plaintiff also had the MRI, which revealed that Plaintiff had levoscoliosis (curvature towards the left) and other abnormalities in his thoracic spine. (413). Specifically, the radiologist noted a disc protrusion at the T5-T6 level with partial encroachment upon the subarachnoid space and a disc herniation at T7-T8 with slight cord invagination and displacement. (413). Although the study was of the thoracic spine, the radiologist also noted a degenerative disc bulge in the mid- to lower-cervical spine, noting that "[d]isc material abuts/almost abuts the anterior cord at C6-7." (413).

Plaintiff returned to Dr. Patel on April 26, 2013. He reported that the March 19, 2013, injection had done nothing to alleviate his knee pain, which he rated as 4 out of 10. (425). He had a decreased range of motion in both knees. (426). He continued to suffer from lower back and neck pain—the former at 6 of 10 and the latter at 8 of 10—and reported numbness in his fingers. (425). Dr. Patel gave Plaintiff an epidural steroid injection at T7-T8 and referred Plaintiff to a Dr. Riley for a consultation relating to his knee pain. (426-27).

The Administrative Record does not contain any records from Dr. Riley or any further records from Dr. Patel. In addition, there are no records from a Dr. Gottlieb, who referred Plaintiff for a nocturnal polysomnography (or overnight sleep study) in October 2012. (451). That study determined that Plaintiff had severe obstructive sleep apnea. (452). Plaintiff had a

CPAP titration study in early December 2012, (445-46), and, presumably, has been using a Continuous Positive Airway Pressure ("CPAP") machine at nights since then.

***Proceedings before the Administrative Law Judge***

Although Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") in March 2012, (135), that hearing was not held until June 4, 2013. During the intervening 15 months, Plaintiff completed several forms which updated the SSA on his medical condition and treatment. The first of these, completed sometime in March 2012, stated that Plaintiff had been experiencing dizziness and a worsening of his other symptoms. (233). Plaintiff stated that he was suffering from headaches, had difficulties walking and standing for long, and had limited use of his hands. (233). It listed three doctors—Castellano, Garjian and Tursi—and stated that Plaintiff had undergone hernia surgery at Staten Island University Hospital on February 29, 2012. (234-35).

The second form appears to have been completed in early May 2012. That document listed four doctors—Savino, Garjian, Tursi and Yumi Kim—and stated that Plaintiff was still following up with all except for Dr. Savino. (240). The document provided Dr. Kim's address and telephone number.

The third form appears to have been completed sometime in late April 2013. It mentioned Plaintiff's December 24, 2012, visit to the Richmond University Medical Center's Emergency Room and listed four physicians: Patel, Garjian, Tursi, and Helen Kim. (243). The document provided the dates of his most recent visits to these doctors, noting that he had seen Dr. Tursi on January 3, 2013, and April 10, 2013, and had visited Dr. Kim on February 18 and 22, 2013, and April 18, 2013. (243) Although the form did not list Dr. Yumi Kim, it

implied that he might still be seeing her by stating that she had "suggested [he] ... see a spinal surgeon for the lower spine." (244). Plaintiff attached business cards for all five of these doctors, which provided their names and addresses. (245).

There is no indication that the ALJ subpoenaed or made any other efforts to obtain medical records from any of these doctors. As noted above, the Administrative Record does not contain any medical records from Dr. Tursi for the period subsequent to April 4, 2012, or any medical records from Dr. Yumi Kim. Though the Administrative Record contains medical records from Dr. Helen Kim/Clover Lakes for the period from June 5, 2012, to February 22, 2013, (329-41, 461-82), the records for the period after July 19, 2012, appear to have been added to the Administrative Record in mid-October 2013—several months after the ALJ ruled on Plaintiff's case. (460).

The Administrative Record contains two Impairment Questionnaires completed prior to Plaintiff's June 4, 2013, hearing before the ALJ. The first of these was completed by Dr. Tursi on May 18, 2012. In a section inquiring about the doctor's diagnoses, Dr. Tursi stated that Plaintiff had migraine headaches, a torn meniscus in the left knee, a torn ligament in the left shoulder, a right inguinal hernia, a herniated disc at L5, and hypertension. (312). He opined that Plaintiff was suffering from constant pain in the left knee and shoulder, head, right inguinal canal, and back, even at rest, and that Plaintiff's pain and fatigue would frequently interfere with his attention and concentration. (313-14, 317). Dr. Tursi estimated that Plaintiff could only stand or walk for one hour in an 8-hour workday, could sit only 4 hours of an 8-hour workday, and could sit for only a half-hour at a time before having to get up for half an hour. (314-15). He further stated that Plaintiff could only occasionally lift objects weighing less than 5 pounds,

had a marked limitation in reaching overhead or manipulating objects with his fingers, and could not push, pull, kneel, bend, or stoop.  (315-16, 318).

The second questionnaire was completed by Dr. Garjian on January 4, 2013.   Although not all of the doctor's diagnoses are decipherable, it is clear that she diagnosed him with injuries to the cervical spine, cervical radiculopathy, and fibromyalgia—a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory, and mood issues. (384, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/ con-20019243).   She provided some of the clinical findings that supported her diagnoses, noting that Plaintiff had a limited range of motion in the neck, the lumbosacral spine, and the left shoulder; numbness in his hands; and positive straight leg raising tests bilaterally.  (384-85). Dr. Garjian opined that Plaintiff could stand, walk, or sit for only one hour or less in an 8-hour workday, and that his pain, fatigue, or other symptoms would constantly interfere with his attention and concentration.   (387, 389).   She also opined that Plaintiff could only occasionally lift objects weighing 5 pounds or less, that he was "depressed due to his condition," and that he would be absent from work more than three days a month due to his various impairments.  (388-90).

### The Hearing before the ALJ

On June 4, 2013, Plaintiff appeared at a hearing before ALJ Hilton Miller.   Although he claimed to be "very familiar" with the doctor's questionnaires, (103), the ALJ began the hearing by asking if there was "anything about [Plaintiff's] condition that would prevent [him] from doing" light or sedentary work.   (98).   Plaintiff testified that he could not sit or stand for long periods of time and could not lift weights.  (98).   When the ALJ asked if he could work a job

23

that permitted him to alternate between sitting and standing, Plaintiff noted that he also had frequent migraines and had to take a nap every day.  (98).

Plaintiff's attorney then questioned Plaintiff, adducing more details concerning Plaintiff's condition.  Plaintiff testified that he had pain in both shoulders that prevented him from lifting his arms over his head, (99), and arthritic pain in his hands that prevented him from gripping things.  (99).  He stated that he had "stabbing" pains in his knees, which prevented him from standing for more than 15 to 20 minutes at a time.  (104).  Plaintiff also mentioned pains in his neck, thoracic spine and lumbar spine, and that he suffered one to five headaches per week which lasted for hours at a time.  (104-05).

Throughout Plaintiff's testimony, the ALJ interjected argumentative questions that revealed his skepticism.  For example, when Plaintiff testified that doctors had told him to avoid heavy lifting for a year after the hernia surgery, the ALJ pointed out that it had been a year since the surgery and asked, "what would prevent you from doing something right now."  (103). Later, the ALJ questioned Plaintiff regarding how many visits he had made to Dr. Garjian, saying, "I don't see a lot of treatment notes." (105).  Plaintiff expressed uncertainty, saying that he saw "so many doctors" he "couldn't give ... an exact number," but eventually estimated that he had "close to 10" visits with that particular doctor.  (105).

The ALJ also questioned Plaintiff regarding his ability to engage in activities of daily living.  He established that Plaintiff could shop, prepare his own meals, and do his own cleaning and laundry.  (108).  However, the questioning also established that Plaintiff was not married and lived alone.  (96, 108).  When questioned by his attorney, Plaintiff clarified that his meals were "fairly simply," requiring him to stand for "[t]en, 15 minutes, if that," and that he made "an

24

elaborate meal" that necessitated "a lot of time on [his] feet" only once or twice a year, when he had friends come over. (109). Plaintiff further clarified that he needed a half-hour break after vacuuming for 10 minutes, and relied on his landlord to help him carry his laundry and groceries upstairs because he could only lift "5, 8 to 10 pounds" without pain. (110-11).

After Plaintiff finished testifying, the ALJ questioned a vocational expert, Melissa J. Fass Karlin. Although the vocational expert was never identified in the hearing transcript, the Administrative Record contains a letter dated April 19, 2013, in which the ALJ requests one Melissa J. Fass Karlin to appear as a vocational expert at the hearing. (188). During the hearing, the ALJ referenced "Exhibit 7B," which is Ms. Karlin's resume, and asked if Plaintiff's counsel had any objections to the expert testimony. (113). Plaintiff's counsel stipulated to the expert's qualifications and did not object to her testimony. (113).

The ALJ asked the expert a hypothetical question regarding whether there would be work available for a hypothetical individual who could "lift and/or carry up to 20 pounds occasionally, 10 pounds frequently; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; ... [engage in] occasional reaching with the left upper extremity, frequent fine and gross manipulation utilizing the left upper extremity, occasional balancing, stooping, kneeling, crouching and crawling ...." (114). The expert responded in the affirmative and listed three light, unskilled jobs that the hypothetical individual could perform: usher, routine clerk, and machine operator. (114). The expert further testified that there were thousands of those jobs available in the local and national economy. (114-15).

Near the end of his examination of the expert, the ALJ modified his hypothetical, asking if there would be any jobs for the hypothetical individual if he would be "off task 20 percent of the time." (115). The expert testified that there would be no work. (115). The ALJ then asked Plaintiff how much he could actually lift. (115). Plaintiff responded that he could lift only 5 to 7 pounds, not 10 or 20. (115).

On his examination of the expert, Plaintiff's counsel continued this line of questioning. First, he asked if there would be jobs for the hypothetical individual if he had to take unscheduled half-hour breaks every two hours. (116). The expert testified that there would be "[n]o work" for such an individual. (116). Plaintiff's counsel then asked if there would be work for the hypothetical individual if he could only sit for three hours and stand for one hour in the course of a work day. (116). The expert again answered in the negative, stating: "[T]hat is less than sedentary work capacity. There would be no work." (116).

### The ALJ's Decision

On June 17, 2013, ALJ Miller issued his decision, finding that Plaintiff was not disabled as defined by §§216(i) and 223(d) of the Social Security Act. In making that decision, the ALJ followed the "five-step sequential evaluation process" dictated by 20 C.F.R. §404.1520(a), which is used to determine whether a claimant is disabled. Under this five-step framework, the SSA must first consider the claimant's work activity. If the claimant is currently engaged in "substantial gainful activity," the claimant is not disabled, regardless of the medical findings. (20 C.F.R. §§404.1520(a)(4)(i), 404.1520(b)). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. (20 C.F.R. §404.1520(a)(4)(ii)). If the claimant does not have "any impairment or combination of impairments which significantly limit [his or her]

physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled. (20 C.F.R. §404.1520(c)).

In the third step, the SSA further considers the medical severity of the impairment(s) by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment or combination of impairments which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. (20 C.F.R. §404.1520(d)). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work." (20 C.F.R. §404.1520(a)(4)(iv)). If the claimant can still do his or her "past relevant work," the claimant is not disabled. (*Id.*). However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." (20 C.F.R. §404.1520(a)(4)(v)). The Social Security Administration bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Applying this five-step process, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2011, the alleged onset date. (67). He found that Plaintiff had several severe impairments: degenerative changes in the left shoulder, right knee, and cervical and lumbar spine, as well as arthritis or arthralgia and residual effects from his hernia surgery. (67). However, the ALJ found that Plaintiff's migraines and hypertension were not severe impairments because there was no evidence that these symptoms had persisted at a severe level for 12 continuous months and they did not cause more than a minimal effect on his functioning. (68). The ALJ also found that no impairments or combination of impairments

met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (68).

At step four, the ALJ determined that Plaintiff did not have the residual functional capacity to perform any past relevant work. (72). At step five, however, he determined that Plaintiff could make an adjustment to other work. (73). Both of those conclusions rested, in large part, on the ALJ's determination that Plaintiff had the residual functional capacity to perform "light work" as defined in 20 C.F.R. § 404.1567(b). Specifically, the ALJ found that Plaintiff had the ability 1) "to occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds," 2) "to stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday," 3) "to frequently fine and gross manipulate with his upper left extremity," and 4) "to occasionally balance, stoop, crouch, crawl, and kneel." (69). The ALJ also found that Plaintiff "could never climb ladders, ropes and scaffolds," "should never use his lower left extremity for operating foot controls," and "would be limited to occasional reaching with his upper left extremity." (69).

In assessing Plaintiff's residual functional capacity, the ALJ relied primarily on the Internal Medical Examination performed by Dr. Salon in January 2012. (70-71). ALJ Miller recounted Dr. Salon's findings at some length in two separate paragraphs in his decision and cited to selected portions of other medical records which corroborated Dr. Salon's results. (70-71). However, the ALJ declined to accept Dr. Salon's opinion that Plaintiff had no physical limitations. Rather, he gave only "some weight to Dr. Salon's opinion," finding that other "evidence" indicated that Plaintiff "would have some physical limitations." (71). The ALJ did

not specify the "evidence" except to state: "For example, the claimant presented on multiple occasions with complaints of shoulder, knee, and back pain that imaging studies confirmed were related to degenerative changes and other findings." (71).

The ALJ acknowledged that Drs. Tursi and Garjian were Plaintiff's "treating physicians," both of whom had opined that Plaintiff could only carry and/or lift up to five pounds occasionally and was substantially limited in his ability to stand, walk or sit. (72). However, the ALJ gave "little weight" to these doctors' opinions for two reasons. First, he asserted that they were inconsistent with "objective evidence" that "showed that [Plaintiff] had intact sensory functioning, 5/5 motor and muscle strength, a normal gait, no neck tenderness, normal range of motion of his left shoulder with a negative impingement test, and negative straight leg raising test." (72). In support of this proposition, the ALJ cited primarily to Dr. Salon's report and to portions of records of Plaintiff's visits to Dr. Helen Kim, the otolaryngologist. (72). The only other records cited were those of Dr. Perel, the neurologist who primarily focused on Plaintiff's complaints of headaches, and Dr. Patel, who determined that Plaintiff had a normal range of motion, but "[s]ignificant tenderness" and "pain," in the left shoulder. (370).

Second, the ALJ opined that the treating physicians' opinions were inconsistent with Plaintiff's activities. (72). The ALJ noted that Plaintiff was capable of "attending to his personal care needs, preparing his own meals on a daily basis ... [and] cooking for friends, doing laundry, cleaning, walking, driving, and going to stores for his shopping needs." (72). ALJ Miller did not mention the fact that Plaintiff was single and lived alone, or discuss the limitations to which Plaintiff had testified. Rather, he characterized Plaintiff as "quite active" and engaged

in "numerous physically challenging activities," and opined that the evidence of Plaintiff's activities "attenuate[d his] credibility."   (71).

### Plaintiff's Appeal

On or about August 9, 2013, Plaintiff's attorney requested that the Appeals Council review ALJ Miller's decision.   (60-61).   The attorney subsequently sent the Appeals Council a letter dated February 19, 2014, in which he challenged the ALJ's decision on three grounds. First, the attorney argued that ALJ Miller had failed to properly weigh the opinion evidence, noting that the ALJ "relied heavily on the report of a one-time consultative examiner" while giving little weight to the treating physicians' opinions.   (250).   In particular, the attorney noted that the ALJ had medical evidence only from the first half of 2012, had ignored evidence supportive of the treating physicians' opinions and had omitted mention of the limitations Plaintiff faced in performing activities of daily living.   (250).

Second, Plaintiff's attorney argued that the ALJ had failed to perform a proper assessment of Plaintiff's residual functional capacity.   Counsel argued that the conclusion that Plaintiff could lift up to 20 pounds and stand and/or walk for 6 hours out of an 8-hour workday was inconsistent with the finding that Plaintiff suffered from severe shoulder and knee impairments.   In addition, Plaintiff's counsel argued that the ALJ should have taken Plaintiff's migraine headaches and depression into account in determining his residual functional capacity, even if those impairments were not severe.

Third, Plaintiff's counsel argued that the ALJ's step-five analysis was flawed.   Counsel noted that ALJ Miller himself concluded that Plaintiff was limited to occasional reaching with his upper left extremity, but that the machine operator and routing clerk jobs that Plaintiff could

hypothetically perform both required frequent reaching.  (251-52).  In addition, the attorney noted that the usher job requires a "great deal of standing and walking," and implied that the ALJ was mistaken in his assessment that Plaintiff could stand and/or walk for 6 hours in an 8-hour workday.  (252).

In addition to presenting these legal arguments, Plaintiff's counsel provided the Appeals Council with additional medical evidence.  All of this evidence post-dated the ALJ's July 2013 decision.  The evidence included a report and a Multiple Impairment Questionnaire from Dr. Joseph DeFeo, an orthopedist who examined Plaintiff on January 13, 2014; a radiology report relating to an MRI of the brain dated January 24, 2014; records relating to a January 27, 2014, visit to the Richmond University Medical Center's Emergency Department; a referral from an orthopedist affiliated with that Medical Center; records of three visits to Dr. Seshadri Das, an endocrinologist; some records from Dr. Garjian, including a letter to Plaintiff's counsel assessing Plaintiff's limitations as of August 26, 2014; and ten pharmacy receipts.  With the exception of the documents from Drs. DeFeo and Garjian, these records do not merit detailed discussion. The MRI showed the same abnormalities as the 2012 MRI.  (35).  The January 2014 emergency room records suggest that Plaintiff suffered a sprained right wrist, (31), and the referral, which is for occupational therapy, presumably relates to that sprain.  (27).  The records from Dr. Das reveal that Plaintiff first consulted this endocrinologist in December 2013 and that Dr. Das found largely minor problems: slight enlargement of the thyroid, consistent with a benign neoplasm; testicular hypofunction; hypertension; esophageal reflux and a vitamin D deficiency.  (11).  The pharmacy receipts all date from 2014 and largely establish that Plaintiff was still taking drugs prescribed years earlier.  (8).

The report from Dr. DeFeo pertains to a consultation in which the doctor was asked to assess Plaintiff's "level of disability and work potential." (36). Although Dr. DeFeo performed his examination in mid-January 2014, he also reviewed MRIs, other studies, questionnaires, and progress notes prepared by the treating physicians—all of which pre-dated July 17, 2013. (39). Based largely on these medical records, the doctor diagnosed Plaintiff with multilevel spondylosis, or degeneration, in the cervical, thoracic, and lumbosacral spine resulting in cervical radiculopathy and motor weakness in both upper and lower extremities. (40). In addition, Dr. DeFeo opined that Plaintiff had chronic rotator cuff tendinosis in the left shoulder and arthrosis (or joint pain) in that shoulder and his knees. (40).

Dr. De Feo's assesssment of Plaintiff's RFC was consistent with Plaintiff's treating physicians' assessments. He opined that Plaintiff could only occasionally lift and carry objects weighing up to 5 pounds due to his lower back problems and lumbosacral spondylosis. (45). He further opined that Plaintiff could sit, stand and walk for only 2 hours during an 8-hour workday, (44), and would need to take unscheduled 5-to-10-minute breaks every 1 to 2 hours. (47). Dr. DeFeo characterized the limitations in Plaintiff's ability to use his arms for reaching as "Marked (Essentially Precluded)," and the limitations on his ability to grasp, turn, twist, and manipulate things with his hands as "Moderate" or "Significantly limited." (45-46). The doctor did not think Plaintiff could push, pull, bend, kneel or stoop at all. (48). Dr. DeFeo expressly stated that these limitations had existed since February 2011. (49).

Dr. Garjian's August 26, 2014, letter to Plaintiff's counsel did not provide any new evidence regarding Plaintiff's condition, but made clear that the opinions she had expressed in her January 2013 Impairment Questionnaire had not changed. (9). She again expressed the

opinion that Plaintiff would be limited in his ability to sit and stand/walk, stating that he could engage in these activities for only one hour each and would have to elevate his legs for 30-minute periods throughout the workday. (9). She further opined that Plaintiff could not push, pull, kneel, bend, stoop, or lift and carry anything weighing more than 5 pounds. (9). In addition, Dr. Garjian believed that Plaintiff's "pain, fatigue and other symptoms" would constantly interfere with his attention and concentration, and would cause him to be absent from work more than three times a month. (9).

### *The Appeals Council's Decision*

In a notice dated December 11, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (1-4). The Appeals Council stated that it had reviewed the new evidence supplied by Plaintiff's counsel, but found that it pertained to Plaintiff's condition after July 17, 2013. (2). The Appeals Council reasoned that this evidence did not affect the decision as to whether Plaintiff was disabled as of June 17, 2013. (2).

### *The Instant Motions*

Plaintiff commenced this action on February 3, 2015. Plaintiff and Defendant now cross-move for judgment on the pleadings. Defendant's motion does not require extensive discussion in that it principally argues that the ALJ was correct in finding that Plaintiff was not disabled. Specifically, Defendant argues that there is substantial evidence to support the ALJ's RFC assessment, his determination regarding Plaintiff's credibility, and the finding that Plaintiff was capable of performing other jobs that existed in significant numbers in the national economy. Defendant also argues that the additional evidence presented to the Appeals Council did not provide a basis for reviewing the ALJ's decision.

Plaintiff's motion raises three points. First, Plaintiff argues that ALJ Miller did not properly weigh the medical evidence and did not properly determine Plaintiff's residual functional capacity. Plaintiff principally argues that the ALJ disregarded the "treating physician rule" by affording "little weight" to the opinions of Drs. Tursi and Garjian, and instead relied primarily on the opinion of Dr. Salon, a consultant who examined Plaintiff on only one occasion and lacked access to Plaintiff's medical records. Plaintiff also notes that the ALJ's RFC assessment differed from Dr. Salon's, and argues that there was no medical evidence to substantiate the ALJ's assessment.

Second, Plaintiff argues that ALJ Miller failed to properly assess Plaintiff's credibility. Plaintiff notes that the ALJ conceded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but nonetheless found that not all of Plaintiff's symptom allegations were credible. Plaintiff argues that the ALJ's conclusion was based on a selective reading of the medical evidence and an erroneous belief that Plaintiff's ability to perform daily activities on a sporadic basis and with the help of others implied an ability to perform full-time work on a sustained basis.

Third, Plaintiff argues that the Appeals Council improperly failed to consider Dr. DeFeo's report and Multiple Impairment Questionnaire. Plaintiff concedes that the report and questionnaire were prepared in January 2014, but notes that the questionnaire expressly states that the limitations described therein existed since February 2011. Plaintiff further notes that Dr. DeFeo considered evidence predating the ALJ's decision and that the doctor's RFC assessment was entirely consistent with the treating physicians' assessments.

## DISCUSSION

### Standard of Review

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g), permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, ... [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision ... in the district court of the United States for the judicial district in which the plaintiff resides ...."   A court's review under 42 U.S.C. §405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.   *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"Substantial evidence" connotes "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).   "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."   *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).   The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.   *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

Upon review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### The Treating Physician Rule

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step process set forth in 20 C.F.R. § 404.1520(a), described on pages 26-27, *ante*. Social Security Rulings and regulations also dictate what evidence the Commissioner must consider, and the manner in which the Commissioner must evaluate the evidence. Among other things, the regulations establish the so-called "treating physician rule" which requires that, under some circumstances, deference be given to the opinions of those physicians who have personally treated social security claimants.

The "treating physician rule" provides that a treating source's opinion regarding the nature and severity of a claimant's impairments that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record should be given controlling weight. 20 C.F.R. § 404.1527(c)(2).

However, the "opinions of a treating physician ... need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino*, 312 F.3d at 588 (citations omitted). The less consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for doing so. 20 C.F.R. §404.1527(c)(2). The Second Circuit has held that "[i]n order to override the opinion of the treating physician, ... the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).

Needless to say, the ALJ cannot assess the amount of medical evidence supporting a treating physician's opinion on an incomplete record. "The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Thus, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*,

168 F.3d 72, 79 (2d Cir. 1999)). "[W]here ... an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, No. 01 Civ. 3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005). Moreover, "[a]n ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity." *Tirado v. Astrue*, No. 10-CV-2482 (ARR), 2012 WL 259914, at *4 (E.D.N.Y. Jan. 25, 2012) (citing *LoRusso v. Astrue*, No. 08-CV-3467 (RJD), 2010 WL 1292300, at *7 (E.D.N.Y. March 31, 2010)).

In this case, the ALJ decided to give "little weight" to treating physicians Tursi and Garjian, while giving substantially more weight to the opinion of the SSA's consultant, Dr. Salon. The ALJ did not, however, explicitly consider the four factors listed in *Selian*. First, while the ALJ acknowledged that Drs. Tursi and Garjian were "treating physicians," (72), and that Dr. Salon merely "administered a consultative physical examination" (71), he did not explicitly consider the frequency, length, nature, and extent of treatment. The record shows that Plaintiff had been seeing Dr. Tursi, an internist, every few months since January 3, 2011, seeking treatment for pain in his knees, shoulders, elbow and lower back, as well as pain in his right inguinal area and various urinary and penile problems. (259). Plaintiff had been seeing Dr. Garjian, a rheumatologist, since February 8, 2012, and had visited her at least five times by January 4, 2013. (392-397). Plaintiff estimated that he had seen Dr. Garjian "close to 10" times by the time of his June 4, 2013, hearing. (105).

Second, the ALJ did not explicitly consider the relative qualifications of Drs. Tursi, Garjian and Salon. Dr. Garjian is a specialist in rheumatology and immunology. (245). Dr. Tursi is Board Certified in Internal Medicine by the American Board of Internal Medicine. (245). In contrast, there is no evidence that Dr. Salon is Board Certified, and ample evidence that he has worked regularly as a consultant for the SSA over the last decade. The Court takes judicial notice of the fact that Salon's consultative examinations on behalf of the SSA have been discussed in no fewer than 30 district court opinions issued over the last seven years.

Third, the ALJ did not explicitly consider the medical evidence supporting the treating physicians' opinions. To be sure, the ALJ's step-two analysis mentioned some of the radiological evidence that established that Plaintiff had severe impairments. In that section, the ALJ acknowledged that an MRI of the left knee showed degenerative changes and a small tear of the anterior cruciate ligament; that an MRI of the thoracic spine showed degenerative changes including a herniated disc at T7-T8; that an MRI of the lumbar spine revealed a herniated disc at L5-S1; and that an MRI of the cervical spine revealed degenerative changes at C3-C7, with "severe stenosis" at C5-C6. (67-68). The ALJ also acknowledged that there was medical evidence of the effects of these impairments: an EMG showing cervical radiculopathy; physical examinations noting a decreased range of motion in the back, left shoulder, neck, elbows and wrists; and records of various epidural steroid injections and nerve blocks.

The ALJ did not mention any of these radiological studies and medical evidence, however, when assessing whether there was medical evidence to support the opinions of Drs. Tursi and Garjian. Rather, relying solely on Dr. Salon's observations and selected excerpts of other medical records which implied that Plaintiff was asymptomatic, he held that the treating

physician's opinions were "inconsistent with the objective evidence." (72). This analysis was flawed in several respects. First, Dr. Salon was not a specialist, but an internist who saw Plaintiff only once for an SSA-arranged medical examination. The Second Circuit has repeatedly "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419 (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).

Second, the ALJ's analysis ignored evidence that contradicted Dr. Salon's findings and the other evidence he cited. For example, the ALJ's decision stated: "Medical professionals found that the claimant had full flexion, extension, and rotary [*sic*] of his cervical and lumbar spines, and that the claimant had negative straight leg raising tests." (70). However, the only evidence cited in support of this statement was Dr. Salon's report. The ALJ failed to mention that Dr. Perel's May 22, 2012, examination of Plaintiff neck revealed a decreased range of motion in all directions by 20-30 degrees, (327); that an examination conducted on June 7, 2012, by one of Richmond Rehabilitation's physical therapists revealed that Plaintiff had a decreased range of motion in the cervical spine; and that Dr. Garjian's January 4, 2013, questionnaire reported positive straight leg raising tests bilaterally. (385). Similarly, the ALJ's decision claimed that "the objective evidence showed that the claimant had ... [a] normal range of motion of his left shoulder," (72), when both Dr. Tursi and Dr. Garjian found that Plaintiff had a limited range of motion in his left shoulder. (256, 258, 384).

Third, the ALJ's determination was based on an incomplete record. Dr. Tursi's questionnaires reflect that Plaintiff visited him every two or three months until at least mid-June 2013, (312, 486), but the Administrative Record does not contain any medical records of visits

subsequent to April 4, 2012.    Plaintiff testified that he paid "close to 10" visits to Dr. Garjian, but the Administrative Record contains indecipherable records of only 5 visits, the last of which took place on January 4, 2013.    The Administrative Record contains no medical records from Dr. Perel other than his letter to Dr. Tursi discussing the initial May 22, 2012, examination, even though the fact that Dr. Perel subsequently referred Plaintiff to Dr. Patel suggests that Dr. Perel saw Plaintiff at least twice.    In addition, the Administrative Record does not contain an RFC assessment from Dr. Patel, even though she was the doctor Plaintiff visited most frequently in the first half of 2013.    In light of this incomplete record, the ALJ could not accurately assess the amount of medical evidence supporting the treating physicians' opinions.

### The ALJ's RFC Assessment

Plaintiff also contends that there was no medical evidence to substantiate the ALJ's assessment of Plaintiff's RFC.    An ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions."    *McBrayer v. Sec'y of Health & Human Servs*., 712 F.2d 795, 799 (2d Cir. 1983) (quoting *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978)).    "Where ... 'the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity,' a medical source statement or formal medical opinion is not necessarily required."    *Monroe v. Comm'r of Soc. Sec*., 676 Fed. Appx. 5, 8 (2d Cir. 2017) (summary order) (quoting *Tankisi v. Comm'r of Soc. Sec*., 521 Fed. Appx. 29, 34 (2d Cir. 2013) (summary order)).    However, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion."    *Burgess*, 537 F.3d at 131 (*Shaw*, 221 F.3d at 134).

As Plaintiff correctly notes, the ALJ's RFC assessment differed even from Dr. Salon's. The doctor concluded, based on his physical examination and the history provided by Plaintiff, that there were "no objective findings to support the fact that the claimant would be restricted in his ability to sit or stand, or in his capacity to climb, push, pull, or cary [sic] heavy objects." (275). The ALJ concluded, however, that Plaintiff "would have some physical limitations." (71). Specifically, the ALJ found that Plaintiff could only occasionally lift and/or carry up to 20 pounds, though he could frequently lift and/or carry up to 10 pounds; could stand and/or walk and could sit for 6 hours in an 8-hour workday; could "frequently fine and gross manipulate with his left upper extremity," but could only occasionally reach with that extremity; and could occasionally balance, stoop, crouch, crawl and kneel, but could never climb ladders, ropes or scaffolds or operate foot controls. (69).

The ALJ's assessment of Plaintiff's RFC was not only contrary to that of Dr. Salon, but contrary to the assessments of every other medical professional in the case. Drs. Tursi and Garjian both opined that Plaintiff could only occasionally lift and carry up to five pounds and could stand and/or walk for an hour or less in the course of an 8-hour workday. They both opined that Plaintiff was limited in his ability to sit, with Dr. Tursi stating that Plaintiff could sit for 4 hours in an 8-hour day and Dr. Garjian stating that Plaintiff could sit for only an hour or less. In addition, Dr. Tursi opined that Plaintiff could not push, pull, kneel, bend and stoop at all, and had marked limitations in his ability 1) to grasp, turn and twist objects; 2) to use his fingers/hands for fine manipulations; and 3) to use his arms for reaching overhead.

The ALJ did not discuss the evidence supporting his assessment of Plaintiff's RFC or explain what evidence led him to reject every medical expert's opinion regarding RFC. In so

doing, he disregarded the dictates of Social Security Ruling ("SSR") 96-8P, which requires that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *7. SSR 96-8P also requires that the RFC assessment "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In this case, it is unclear what, if any, evidence supports the ALJ's assessment of Plaintiff's RFC. The ALJ made only a vague reference to "above cited evidence," and provided but a single "example" of that evidence: Plaintiff's own "complaints of shoulder, knee, and back pain" which, the ALJ noted, were "confirmed" by radiological evidence of degenerative changes. (71). By citing this "example," the ALJ implicitly credited Plaintiff's testimony that pain created limitations on his ability to work. Yet, the ALJ's RFC assessment implicitly rejected Plaintiff's testimony regarding the extent of those limitations. In his "Function Report," Plaintiff stated that he could not stand "for long periods," (217, 219), and that he could only walk 100 to 500 feet before having to stop and rest for a period of five minutes. (221). In an update completed in March 2012, Plaintiff stated that he was suffering from headaches, had difficulties walking and standing for long, and had limited use of his hands. (233). At the hearing before the ALJ, Plaintiff provided specifics regarding these conditions, testifying that he suffered one to five headaches per week, each of which lasted for hours at a time and forced him to take a nap every day, (98, 104-05); that he had "stabbing" pains in his knees, which prevented him from standing for more than 15 to 20 minutes at a time, (104); that he could not sit for long periods of time or

43

lift weights, (98); that pain in both shoulders prevented him from lifting his arms over his head, (99); and that arthritic pain in his hands prevented him from gripping things. (99). None of the evidence supplied by Plaintiff provided a basis for the ALJ's RFC assessment.

Indeed, the only document in the record which supports the ALJ's assessment of Plaintiff's RFC to any degree is Examiner Scott's Physical Residual Functional Capacity Assessment. Like the ALJ, Examiner Scott opined that Plaintiff could occasionally lift and/or carry up to 20 pounds; could frequently lift and/or carry up to 10 pounds; could stand and/or walk and could sit for 6 hours in an 8-hour workday. (119). Scott also opined that Plaintiff was limited in his ability to reach, and did not find any other limitations in gross or fine manipulation of objects. (120). However, since Examiner Scott was not himself a medical consultant, the ALJ could not rely on his opinions. *See Tankisi*, 521 Fed. Appx. at 34-35 ("It is ... error to treat a disability analyst as a doctor."); *see also Castano v. Astrue*, 650 F. Supp. 2d 270, 281 (E.D.N.Y. 2009). Moreover, the Court notes that Examiner Scott's assessment itself was unsupported by the very minimal medical evidence that was in the record at the time he made that assessment.

### The ALJ's Credibility Determination

Plaintiff's second point—that ALJ Miller failed to properly evaluate Plaintiff's credibility—raises issues similar to those discussed above. "As a fact-finder, an ALJ is free to accept or reject testimony" offered by claimants. *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). That credibility determination, however, "cannot be based on an intangible or intuitive notion about an individual's credibility." Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR

96-7P, 1996 WL 374186 at \*4.   "A finding that the witness is not credible must ... be set forth with sufficient specificity to permit intelligible plenary review of the record."   *Williams*, 859 F.2d at 260-61 (citing *Carroll v. Sec'y of Health & Human Servs*., 705 F.2d 638, 643 (2d Cir. 1983)).

In this case, the ALJ found that Plaintiff had medically determinable impairments that "could reasonably be expected to cause some of the ... symptoms" alleged by Plaintiff, but that not all of Plaintiff's symptom allegations were credible.   (70).   He never expressly stated, however, which symptom allegations he found to be credible or incredible, or explained why he reached those conclusions.   At most, the ALJ's decision implied that he credited Plaintiff's claims of shoulder, knee, and back pain, finding that this pain created some "physical limitations."   (71).

In addition, the evidence which the ALJ cited in support of his decision to discredit Plaintiff's allegations that his symptoms hindered his ability to work was plainly insufficient. First, the ALJ relied on Dr. Salon's observations that Plaintiff was not in acute distress, walked normally without any assistive devices, could change for the examination without assistance, and could rise from a chair and get on and off the examination table without assistance.   Dr. Salon's findings may have supported his opinion that Plaintiff was not at all limited in his ability to sit, stand, climb, push, pull or carry heavy objects, but the ALJ expressly rejected that opinion, finding that Plaintiff "would have some physical limitations."   (71).   None of Dr. Salon's observations permitted any inference regarding how long Plaintiff could stand, walk, or sit over the course of an 8-hour workday; how much weight Plaintiff could carry; or whether Plaintiff could engage in the sustained physical activity required in a workplace.

Second, the ALJ relied on Plaintiff's own statements and testimony regarding his daily activities to find that Plaintiff was "quite active" and, therefore, not as disabled as he alleged. However, to substantiate this point, the ALJ engaged in highly selective reading of the evidence offered by Plaintiff. The ALJ noted, for example, that Plaintiff could prepare his own meals (71), but ignored Plaintiff's testimony that he could cook only "fairly simpl[e]" meals because he could not stand for long. (108, 217). Similarly, the ALJ noted that Plaintiff could clean, shop and do laundry (71), while ignoring Plaintiff's claims that he needed a half-hour break after vacuuming for 10 minutes, and relied on his landlord to help him carry laundry and groceries upstairs because he could only lift "5, 8 to 10 pounds" without pain. (110-11). "It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, [and] ... to ignore parts of the record that are probative of the claimant's disability claim." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004).

### Plaintiff's Remaining Arguments

For the reasons stated above, the Court will reverse the decision of the Commissioner of Social Security, and remand the cause to complete the medical record and for a rehearing consistent with this Memorandum and Order. Plaintiff will be able to present additional information and relevant medical evidence at that rehearing, during which the ALJ should consider all relevant evidence including the report from Dr. DeFoe.

## *CONCLUSION*

For the reasons set forth above, this Court denies the Commissioner's motion for judgment on the pleadings, and grants Plaintiff's cross-motion to the extent of reversing the decision of the Commissioner and remanding this action for further proceedings consistent with this Memorandum and Order.   The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York

Dated: May 1, 2018
       Brooklyn, New York